9          IN THE UNITED STATES DISTRICT COURT

10              FOR THE DISTRICT OF OREGON

11  SARA D. MORELL,                    )
                                       )
12              Plaintiff,             )
                                       )    No.  CV-04-6357-HU
13      v.                             )
                                       )
14  JO ANNE B. BARNHART,               )
    Commissioner of Social            )    FINDINGS & RECOMMENDATION
15  Security,                          )
                                       )
16              Defendant.             )
    ───────────────────────────────────)

17
    Kathryn Tassinari
18  Drew L. Johnson, P.C.
    1700 Valley River Drive, First Floor
19  Eugene, Oregon 97401

20       Attorney for Plaintiff

21  Karin J. Immergut
    UNITED STATES ATTORNEY
22  District of Oregon
    Neil J. Evans
23  ASSISTANT UNITED STATES ATTORNEY
    1000 S.W. Third Avenue, Suite 600
24  Portland, Oregon 97204-2902

25  Leisa A. Wolf
    SPECIAL ASSISTANT UNITED STATES ATTORNEY
26  Social Security Administration
    701 5th Avenue, Suite 2900 M/S 901
27  Seattle, Washington 98104-7075

28       Attorneys for Defendant


1 - FINDINGS & RECOMMENDATION

HUBEL, Magistrate Judge:

Plaintiff Sara D. Morell brings this action for judicial review of the Commissioner's decision to deny supplemental security income (SSI) both as a child and as an adult. This Court has jurisdiction under 42 U.S.C. §§ 405(g) (incorporated by 42 U.S.C. § 1383(c)(3)). I recommend that the Commissioner's decision be affirmed.

PROCEDURAL BACKGROUND

On May 26, 2001, plaintiff's father Victor Morell applied for SSI benefits on plaintiff's behalf, alleging an onset of disability as of November 1, 1984, plaintiff's date of birth. Tr. 85-87. The application was denied initially and on reconsideration. Tr. 70-79. Plaintiff requested a hearing. Tr. 80.

On November 1, 2002, plaintiff turned eighteen and required a disability evaluation based on criteria for adult claimants. She was given a protective filing date on an application for adult SSI payments. Tr. 33.

A joint hearing on plaintiff's child and adult claims was held on October 15, 2003, before an Administrative Law Judge (ALJ). Tr. 534-75. Plaintiff was represented by counsel. Id. On December 24, 2003, the ALJ found plaintiff not disabled under the standards for a child's claim and an adult claim. Tr. 17-42. The Appeals Council denied plaintiff's request for review of the ALJ's decision. Tr. 7-15.

FACTUAL BACKGROUND

Plaintiff alleges disability beginning at birth, based on chronic fatigue syndrome, Epstein-Barr virus, carpal tunnel syndrome, depression, headaches, bouts of infectious mononucleosis,

2 - FINDINGS & RECOMMENDATION

fibromyalgia, post-traumatic stress disorder, dyslexia, myofascial pain syndrome, and a large number of symptoms including frustration, anxiety, forgetfulness, mood swings, handwriting difficulties, post-exertional malaise, jaw clenching, inability to run, dance, swim, drive a car, or play sports, sleep anomaly (non-restorative sleep), and insomnia. Tr. 21. At the time of the October 15, 2003 hearing, plaintiff was almost nineteen years old. Tr. 85.

After dropping out of high school in tenth grade, plaintiff obtained a general equivalency diploma (GED) at age sixteen. Tr. 544. Before she dropped out, she had a Section 504 Plan to allow her to attend for a shorter school day. Tr. 145, 184. She has worked briefly for a cleaning service. Tr. 546.

I. Medical Evidence

The medical evidence begins with plaintiff's admission to a psychiatric hospital at age eight, for depression. Tr. 434-54. This event coincided with her parents' divorce. Tr. 447. The record demonstrates that plaintiff has continued to suffer from depression, with, as noted below, the ALJ concluding that it is one of plaintiff's severe impairments. Tr. 22, 29, 35, 41 (ALJ decisions); 339 (Dr. Mary Lou Belozer's March 1999 chart note indicating possible underlying depression and personality disorder); 344 (May 1999 chart note from Dr. Claudia Goulston stating that depression may be playing a role in plaintiff's fatigue); 530 (December 2000 chart note from Dr. William Barish stating that in his opinion, depression is plaintiff's leading cause for her fatigue); 489 (Dr. Albert Turbessi's September 1996 chart note opining that he strongly suspects pure psychiatric

3 - FINDINGS & RECOMMENDATION

diagnosis).

Over the years, plaintiff has seen numerous physicians, both in Pennsylvania where her father lives, and in Oregon, where her mother lives. The extensive records show treatment by primary care practitioners and specialists on occasion. Not all of the records are relevant to the issues in this litigation. Thus, discussed here is only the medical evidence pertaining to the alleged errors by the ALJ raised by plaintiff in this appeal.

Plaintiff treated with Dr. Mary Lou Belozer, M.D., at Samaritan Health Physicians in Lebanon, Oregon, from February 12, 1999, to April 6, 1999. Tr. 337-43. Dr. Belozer questioned whether plaintiff had chronic fatigue syndrome (CFS) and suspected that plaintiff's fatigue was secondary to depression and personality disorder. Tr. 338. She ultimately suggested that it would be more appropriate for plaintiff and her mother to seek health care at another facility after plaintiff's mother hung up the phone during a conversation with Dr. Belozer when Dr. Belozer opined that plaintiff could go to school. Id.

Plaintiff then sought treatment from Dr. Claudia Goulston, M.D., at PeaceHealth Medical Group in Eugene, Oregon, from April 9, 1999, to May 21, 1999. Tr. 344-49. Dr. Goulston noted that based on plaintiff's report, plaintiff had a "history of chronic fatigue type syndrome." Tr. 344. Dr. Goulston noted that plaintiff had some positive tender points on her chest wall, but had some false positives in the supraclavicular areas and was not tender over her arms. Id. In her assessment, she suggested that plaintiff might have multiple reasons for her fatigue and that depression might be playing a role. Id.

4 - FINDINGS & RECOMMENDATION

From May 1999 to December 2000, plaintiff treated with Dr. William G. Barish, M.D., in Lebanon, Oregon. Tr. 248-61. Her first visit was with a physician's assistant in Dr. Barish's practice who noted that according to her mother, plaintiff had cytomegalovirus (CMV) and that she is tired all the time. Tr. 254. Her immediate concern on that date, however, was a sore throat and ear ache. Id.

The record shows that she was not seen again until July 2000, this time by Dr. Barish himself. Tr. 253. At this time, plaintiff reported to Dr. Barish that she had seen an infectious disease specialist in Eugene who had diagnosed her with CMV and that it caused her chronic fatigue. Id. Dr. Barish indicated that the chronic headaches she complained of were of uncertain origin and could be some type of frontal sinus problem. Id. He was unclear of how to proceed because plaintiff was leaving in two days to return to the east coast. Id. He gave her samples of a prescription nasal spray with instructions to use two sprays in each nostril once per day for one month, and then to report to a physician on the east coast. Id.

Plaintiff returned to see Dr. Barish in November and December 2000. Tr. 250-51. She did not mention fatigue until the December 2000 appointment. Tr. 250. She reported having been diagnosed by physicians in the past in Pennsylvania with chronic Epstein-Barr virus (EBV) and possibly chronic CMV. Id. Dr. Barish noted that she suffered from chronic fatigue of uncertain etiology but that he favored depression as the leading cause. Id. He also opined that her chronic headaches were likely muscle contraction, or possibly rebound headaches or caffeine withdrawal headaches. Id.

5 - FINDINGS & RECOMMENDATION

As noted, although plaintiff saw the physician's assistant in Dr. Barish's office in May 1999, she did not return to that clinic to see Dr. Barish himself until July 2000. It appears that at least for part of this time, she was in Pennsylvania because in February 2000, she was assessed by Dr. Michael D. Green, M.D., M.P.H., an infectious disease specialist there. Tr. 368-73. Dr. Green determined that plaintiff did not meet all of the diagnostic criteria established by the Centers for Disease Control for CFS. Tr. 372. He suggested that plaintiff receive a psychiatric evaluation before any diagnosis of CFS could be confirmed. Tr. 373. He opined that there could be psychological explanations for her fatigue. Id.

Plaintiff treated with Volney Willett, M.D., and Robert Wirth, M.D., at the Corvallis Clinic from February 13, 2001, to February 7, 2002. Tr. 307-18, 374, 505-26. At the initial visit, Dr. Wirth, based on plaintiff's and her mother's reports of her past medical history, assessed plaintiff as having CFS, "plus or minus chronic Epstein-Barr," and chronic headaches. Tr. 314-15. He planned to perform a number of tests, take a chest x-ray, and change her medications. Tr. 315.

In a follow-up appointment two months later in April 2001, Dr. Wirth noted that plaintiff benefitted from the new medications, and although she was sleeping approximately twelve hours at a stretch, this was down from fifteen to sixteen hours, and plaintiff reported more energy during the day and an ability to get things done. Tr. 311. He noted that her hepatitis serologies were negative, and that her Epstein-Barr VCA antibody was 1 to 640, suggesting a past exposure to EBV, but no current infection. Id., 316-17, 523.

6 - FINDINGS & RECOMMENDATION

The next chart note from treatment at the Corvallis Clinic is dated January 24, 2002, and is from Dr. Willett. Tr. 307-08. She makes no reference to plaintiff having been seen by Dr. Wirth, and instead remarks that plaintiff is there to establish care. Id. Dr. Willett remarked that plaintiff appeared with multiple complaints, including low back pain, fatigue, and weakness, and that a Dr. Lila McQueen, Ph.D., had diagnosed plaintiff with depression, post-traumatic stress disorder, and panic disorder. Tr. 308. Dr. Willett noted that "[t]he family is looking into getting disability for this patient." Id. In her assessment, Dr. Willett remarked on plaintiff's and her family's "long history of medical and psychological issues[.]" Tr. 309. She noted, based on plaintiff's and her mother's report of plaintiff's history, plaintiff's CFS and EBV, and remarked on her February 2001 EBV-VCA laboratory results. Id. She also noted that in response to the family's expressed curiosity about fibromyalgia, she would have plaintiff see Dr. Ladd. Id.

Plaintiff saw Dr. John Ladd, M.D., on February 6, 2002. He remarked that plaintiff and her mother "indicate that they would like to have a definite diagnostic label so they could have her labeled as having a disability." Tr. 324. Dr. Ladd determined that she did not meet the criteria for fibromyalgia and he wondered how much of her symptomatology was related to psychological factors. Tr. 325. He noted that it was in plaintiff's best interest to be encouraged to increase her activity rather than limit it. Id.

Plaintiff returned to see Dr. Willett the next day. During that visit, Dr. Willett noted that plaintiff was "well-appearing,"

7 - FINDINGS & RECOMMENDATION

and in "no acute distress[.]" Tr. 374. She also remarked that "[t]he patient and her mother are looking for a diagnosis of fibromyalgia. . . . The patient and her mother do not seem to be happy with not being diagnosed with fibromyalgia and are asking for a second opinion. . . . The patient is trying for a diagnosis of fibromyalgia like her mother and aunt. They are both on disability. They are working with social security to get disability for these diagnoses." Id. Dr. Willett referred plaintiff to a Dr. Hudson for further evaluation. Id. Dr. Willett also recommended plaintiff to the fibromyalgia clinic at Oregon Health & Sciences University, but plaintiff did not want to go that far. Id.

Before seeing Dr. Willett in January 2002, plaintiff was examined by Dr. David Morrell, M.D., on December 1, 2001. Tr. 280-83. He noted her chief complaints as fatigue and depression. Tr. 280. She also complained of headaches. Id. She reported having CFS and EBV, and was currently taking Zoloft and Trazodone. Id.

Dr. Morrell noted that plaintiff appeared healthy and non-tired. Tr. 281. On physical examination, he noted that she had upper cervical chain lymphadenopathy which was mildly tender and with the lymph nodes measuring up to approximately 2.0 centimeters. Id. Under his "General Findings," he indicated that she had mild tenderness in the paravertebral regions of the lower cervical spine and upper lumbar spine with the fibromyalgia examination 4/18. Tr. 282. He concluded that she suffered from EBV syndrome because of her mildly tender residual upper cervical chain lymphadenopathy. Tr. 283. But, he explained, she appeared well and he expected a complete and fully recovery from the EBV infection. Id. She did

8 - FINDINGS & RECOMMENDATION

not meet the criteria for fibromyalgia.  Id.

During the time that plaintiff was treating at the Corvallis Clinic, she was seeing Dr. Lila McQueen, Ph.D., a clinical psychologist.  Tr. 284-99, 386-95, 429-30.  Plaintiff saw Dr. McQueen for just over one month, from October 23, 2001, until November 27, 2001.  Id.  The record also shows an attempt at a visit in July 2002.  Tr. 386-87.

Dr. McQueen's intake note, dated October 23, 2001, recites plaintiff's presenting problems as identity conflict, low energy, poor achievement, stress, depression, interpersonal conflict, oppositional behavior, poor self-esteem, anxiety, labile mood, memory impairment, and sleep disturbance.  Tr. 298.  At the time, plaintiff was taking Zoloft and Trazodone.  Id.  Her mental status was anxious and depressed.  Id.  Plaintiff reported medical conditions of EBV syndrome, CFS, recurrent mononucleosis, chronic pain, history of bladder and kidney infections, and recurrent colds and flu.  Id.  Dr. McQueen diagnosed plaintiff with major depression, paid disorder, and post-traumatic stress disorder.  Tr. 299.  Her treatment plan was for individual and family therapy.  Id.

Plaintiff saw Dr. McQueen for therapy on November 6, 2001, November 15, 2001, and November 27, 2001.  Tr. 291-97.  Dr. McQueen's diagnoses remained the same throughout these sessions, although her notes reflect an exacerbation of symptoms on two occasions (November 6, 2001, November 27, 2001), and slight improvement on another (November 15, 2001).  Tr. 291, 294, 296).

On November 19, 2001, Dr. McQueen wrote a letter to Linn-Benton Community College in support of plaintiff's request for an

9 - FINDINGS & RECOMMENDATION

extension of the deadline for reimbursement of fees.  Tr. 293.  Dr. McQueen stated that plaintiff had major depression, post-traumatic stress disorder, a learning disability in math, dyslexia, chronic pain, and CFS.  Id.  According to Dr. McQueen, these disorders made it difficult for plaintiff to concentrate, get and stay organized, remember details, including appointments and deadlines, and could impair her ability to make decisions.  Id.  She further stated that the pain and fatigue caused plaintiff to have decreased or no participation in regularly scheduled activities, disrupting her ability to lead a normal lifestyle.  Id.

On November 29, 2001, Dr. McQueen issued an attention deficit disorder assessment report, indicating that plaintiff was referred to Dr. McQueen for assessment and evaluation of this particular disorder.  Tr. 286-90.  Testing revealed that plaintiff did not meet the criteria for attention deficit disorder.  Tr. 290.

On December 11, 2001, Dr. McQueen wrote to Disability Determination Services regarding plaintiff, rendering the same opinions expressed in her November 19, 2001 letter to the community college.  Tr. 285.  Thus, she stated that plaintiff had major depression, post-traumatic stress disorder, a learning disability in math, dyslexia, chronic pain, and CFS.  Id.  She further stated that plaintiff had difficulties in concentration, getting and staying organized, and remembering details, including appointments and deadlines, and that these impairments would likely be lifelong.  Id.

Dr. McQueen did not see plaintiff again after her November 27, 2001 appointment, until July 30, 2002.  Tr. 386-87.  At that time, plaintiff's mother drove plaintiff to Dr. McQueen's office, after

10 - FINDINGS & RECOMMENDATION

plaintiff's mother had called Dr. McQueen several times, because plaintiff's mother was concerned about plaintiff's suicide risk in light of plaintiff's two dogs having been killed and plaintiff stopping certain medication against medical advice.  Tr. 386. Plaintiff, however, refused to see Dr. McQueen, walking away from the van and refusing to come into the office.  Id.  When Dr. McQueen came outside, plaintiff was uncooperative, seemed resentful and oppositional, and walked away when Dr. McQueen asked her about suicidal ideation.  Id.  Upon plaintiff's mother's request, Dr. McQueen suggested two hospitals where plaintiff's mother could take plaintiff, after which plaintiff and her mother left.  Id.

Following this, the only other report from Dr. McQueen in this administrative record is an August 4, 2003 psychological report in which Dr. McQueen opines that plaintiff has functional limitations of stamina, impulse control, concentrating/distractability, reasoning/memory, coping skills, interpreting information, and interpersonal skills.  Tr. 429.  Dr. McQueen recited a list of plaintiff's symptoms and the testing Dr. McQueen performed, presumably in October and November 2001.  Id.  She recited plaintiff's diagnoses from November 2001 and then opined that full-time employment would be difficult or impossible for plaintiff and that she might not be able to perform part-time work.  Tr. 430.

Following her treatment with Dr. Willett in February 2002, plaintiff then began seeing nurse practitioner Sandra Young at Corvallis Internal Medicine, in late February 2002, and continued to treat with her until June 24, 2003.  Tr. 375-85, 401-12.  It appears that at the first visit, plaintiff was actually seen by Dr. James Gallant, M.D., and thereafter was followed by Young.  Id.

11 - FINDINGS & RECOMMENDATION

At the February 27, 2002 visit with Dr. Gallant, plaintiff's mother reported that she herself had fibromyalgia and chronic fatigue, and that plaintiff had both diseases as well. Tr. 384. After a physical exam which showed multiple trigger points over the head, neck, back, arms, and legs, which Dr. Gallant described as fairly consistent with fibromyalgia, he assessed plaintiff as having "[s]ymptom complex, consistent with myofascial pain, fibromyalgia, chronic fatigue and depression." Id. He noted that plaintiff reported running and exercising daily, and he encouraged her in "lifestyle, diet and exercise" by encouraging her to stay physically active and "mentally engage." Id. He also changed some of her medications. Id.

Following that initial visit, plaintiff began seeing Young. Tr. 375-85, 401-12. Young's treatment records show that medications were working well and although plaintiff appeared quite fatigued at her March 19, 2002 appointment, plaintiff continued daily exercise, walking, and a home exercise routine. Tr. 383. On May 7, 2002, Young reported that plaintiff was "doing well," had moved to Beaverton and was cleaning houses, although plaintiff reported that this activity wore her out. Tr. 382. Her medication was working well for her, although she reported still sleeping quite a bit. Id. On August 23, 2002, Young noted that the medication was helping the CFS. Tr. 381. In November 2002, Young reported that plaintiff was "doing pretty well," and that her CFS and chronic pain were stable. Tr. 378.

Plaintiff did not see Young again until March 18, 2003, when she complained of severe neck pain. Tr. 376. Young noted plaintiff's struggle with trying to obtain disability and indicated

12 - FINDINGS & RECOMMENDATION

that plaintiff was unable to work.  Id.  Young saw plaintiff again on April 2, 2003, and remarked that plaintiff was in "mild physical distress."  Id.

In an April 24, 2003 letter to plaintiff's attorney, Young opined that she had seen plaintiff once or twice per month since February 27, 2002, and that plaintiff's symptoms had worsened over that time.  Tr. 375.  She indicated that when plaintiff came to Young's office, she appears quite fatigued, groggy, and slow to respond to questions.  Id.  She stated that plaintiff was unable to perform routine activities of daily living and required help from friends with daily chores.  Id.  Young reported that plaintiff's testing for lupus and rheumatoid arthritis was normal, as was her routine lab work and an x-ray of her cervical spine.  Id.  Young reported that plaintiff had been fairly compliant in her plan of care, yet continued to deteriorate, and that in her professional opinion, plaintiff would be unable to hold down any sort of employment related to pain and severe fatigue.  Id.

II.  Plaintiff's Testimony

Plaintiff testified at the hearing that she was living with a friend, having lost her public assistance housing over a conflict with her landlord regarding her dog.  Tr. 539-40.  She relied on her mother and stepfather for financial support.  Tr. 540.

At the time of the hearing, she was taking the following medications:  Lexapro for depression, Naproxen as an anti-inflammatory, Acyclovir for herpes, Zoloft for depression, Provigal

for depression[1], Nexium for ulcer symptoms, hydrocodone as needed for pain, and birth control pills. Tr. 164, 540-41. She explained that she obtained the hyrocodone from a hospital for a specific condition, but she does not take it regularly. Tr. 542.

The friend plaintiff was living with and plaintiff's boyfriend do most of the cleaning, but sometimes plaintiff does laundry to help out if she can. Tr. 542. Plaintiff stated that she cannot do household errands or grocery shopping because she ends up in pain in less than fifteen or twenty minutes. Tr. 548. On a good day, she is able to do some laundry or make her bed, but most of the time, such chores do not get done. Tr. 549. She cannot do the dishes. Tr. 552.

She experiences pain all over - from head to toe, including headaches and nausea. Tr. 548. She is in pain constantly, and it worsens with activities. Tr. 548-49. She experiences constant fatigue. Tr. 550-51.

She sleeps approximately ten to thirteen hours per night. Tr. 549. After her extended sleep, on an average day she will take a shower, which takes an hour, and then sometimes read or watch television.[2] Tr. 550. However, some days she is too sick to get

---

[1] Although the medication chart plaintiff filled out states that Provigal was for depression, Tr. 164, during the hearing she indicated that it is a narcolepsy drug which she took in order to regain energy. Tr. 551. She further testified that it made her sick, shaky, and caused her heart to pound. Tr. 551. Although she did not expressly testify that she no longer took the drug, I presume she ceased taking it based on her testimony.

[2] How much plaintiff reads is questionable based on her later testimony that she has difficulty reading and it makes her sick. Tr. 553, 555.

14 - FINDINGS & RECOMMENDATION

out of bed or to shower.  Tr. 553.  She has a hard time concentrating and gets headaches several times per week.  Tr. 553.

She does not go out, but instead visits with friends who come over while she sits or rests in bed.  Tr. 552.  Approximately six weeks before the hearing, plaintiff obtained her driving permit, although she stated that she had only been able to drive short distances and only a handful of times.  Tr. 556.

Since getting her GED, plaintiff tried to attend two community college classes, but ended up taking only one.  Tr. 545.  It met two hours, twice each week, in the evening.  Id.  She completed the class, obtaining an A, but she did not enroll for further classes after completing the one, because it was too hard to keep up even with the one class.  Tr. 558.  She explained that she missed a lot of the classes and got an A in the course because the teacher was "really understanding" and allowed her to do a lot of work at home.  Id.

As far as work experience, she attempted to work at a cleaning service with a friend twice per week, but she could not keep up.  Tr. 546.  She stated that she would have to sit down and stop and then would go to sleep.  Id.  She became fatigued.  Id.

Plaintiff testified that over the last few years, her pain and fatigue had worsened.  Tr. 556-57.  She stated that she is frequently ill because of EBV, and that even sitting or standing for a long time causes her pain.  Tr. 551-52.  Even with a job that was not physically demanding, she could do it only for an hour, if she pushed herself "to the limits."  Tr. 553.

III.  Lay Witness Testimony

Plaintiff's mother Linda Tuma testified at the hearing.  She

15 - FINDINGS & RECOMMENDATION

sees her daughter almost daily. Tr. 560. Plaintiff lived with her mother and stepfather up to approximately eighteen months before the hearing. Id. Tuma takes plaintiff to doctor and dentist appointments and also takes her shopping. Tr. 561. She does errands for plaintiff, including her grocery shopping, and helps her with things like laundry. Id.

She described plaintiff as always being sick, always having been sick, and always having been fatigued. Id. According to Tuma, plaintiff has been chronically fatigued, sometimes sleeping for days on end, since she was five or six years old. Id. She noted plaintiff's chronic flu-like symptoms, colds, chronic infections, chronic strep throat, and bouts of depression. Tr. 562. She described plaintiff's average day as one in which plaintiff does not get up until 1:00 or 2:00 in the afternoon, and then "she just kind of sits around her house." Id. She rarely goes out with her boyfriend. Id. Plaintiff will occasionally go shopping with Tuma if Tuma has taken her to an appointment. Tr. 565. For clothes shopping, she does not try clothes on in a store, but takes them home with her instead because she is too tired to do it in a store. Id.

Although Tuma offered to pay for plaintiff to take classes at the community college, plaintiff does not feel well enough to do it. Id. Tuma opined that plaintiff's depression had gotten worse in the last two or three years. Tr. 566.

IV. Vocational Expert Testimony

The ALJ posed the following hypothetical to vocational expert (VE) Kay Hartgrave: an individual who is eighteen years old with a GED and no past relevant work, who has no exertional limitations,

16 - FINDINGS & RECOMMENDATION

but who should not have close interaction with the general public and no jobs that require extensive math or reading. Tr. 573. In response, the VE testified that such a person could work as an animal shelter helper, a sorter of soft goods, a distribution worker for printed products, and an optical goods worker. Tr. 573-74.

On cross-examination, the VE was asked to consider a hypothetical person who is unable to work more than one or two hours in a day. Tr. 574. The VE testified that those limitations would preclude full-time competitive work.

THE ALJ'S DECISION

Because, as noted below, the standards for a child's claim are different than those for an adult claim, the ALJ issued two separate decisions in the case. However, the reasoning in support of the ALJ's ultimate conclusion in each decision, is essentially the same.

I.   Adult Claim

The ALJ found that plaintiff has not engaged in any substantial gainful activity since her alleged onset date. Tr. 34, 41. The ALJ then found that plaintiff had severe impairments of personality disorder, somatoform disorder, depression, and a learning disorder focused primarily in math. Tr. 35, 41. While finding the impairments to be severe, the ALJ concluded they did not meet or equal any listed impairments. Id.

The ALJ then determined that plaintiff retained the residual functional capacity (RFC) of no exertional limitations, no close interaction with the general public, and a limit in extensive math or reading requirements. Tr. 39, 41.

In reaching this RFC determination, the ALJ rejected plaintiff's subjective limitations testimony. She found that plaintiff had no difficulties in her activities of daily living or in maintaining social functioning, that she had mild difficulties in maintaining concentration, persistence, or pace, and that she had no episodes of decompensation. Tr. 36. The ALJ rejected the opinion of nurse practitioner Young that plaintiff was unable to work because of pain and fatigue. Tr. 37-38. The ALJ noted that Young's statement of disability was not a statement as to a medical issue regarding the nature and severity of an individual's impairment, and was not the proper subject for a medical source as the final responsibility for deciding the issue of disability is reserved to the Commissioner. Tr. 38 (citing 20 C.F.R. § 416.927(e), Soc. Sec. Reg. 96-5P).

The ALJ also noted that as a nurse practitioner, Young is not an acceptable medical source under 20 C.F.R. § 216.913. Tr. 38. The ALJ further commented that Young's opinion was based on the unreliable testimony of plaintiff and her mother. Id. Finally, the ALJ noted that Young's conclusion was not supported by the medical records which show no deteriorating condition. Id.

The ALJ also rejected Dr. McQueen's August 2003 opinions that plaintiff had severe limitations and would find it difficult or impossible to work full-time. Tr. 38. The ALJ noted that Dr. McQueen had not seen plaintiff in more than one year at the time she rendered this opinion. Id. The ALJ further noted that Dr. McQueen's opinion was based on reports of fibromyalgia or chronic fatigue, as well as reports of problems with concentration which were not supported by objective testing done by Dr. McQueen or Dr.

18 - FINDINGS & RECOMMENDATION

Smolen.  *Id.*

The ALJ found plaintiff's mother not credible and commented that plaintiff and her mother focused on obtaining disability benefits for plaintiff, with more than one physician noting her desire to receive disability.  Tr. 27, 39.  The ALJ also found plaintiff to be not forthcoming in reporting, citing one example in which plaintiff reported having been diagnosed with attention deficit disorder after it had been specifically ruled out by testing some months before.  Tr. 39.

The ALJ concluded that plaintiff had no past relevant work experience.  Tr. 40, 41.  Based on the RFC, and relying on the VE testimony, the ALJ concluded that plaintiff retained the ability to perform the jobs of animal shelter worker/helper, soft goods sorter, distributor of printed products, or as an optical goods worker.  Tr. 40-41.  Accordingly, she concluded that plaintiff was not disabled.

II.  Child Claim

As with the adult claim, the ALJ's decision in the child claim starts with a finding that plaintiff has not engaged in any substantial gainful activity since the alleged onset of her disability, through the age of eighteen.  Tr. 21, 29.  Next, the ALJ determined that plaintiff has severe impairments of personality disorder, somatoform disorder, depression, and a learning disorder, primarily in math.  Tr. 22, 29.  While finding these to be severe impairments, the ALJ concluded that they do not meet, medically equal, or functionally equal the criteria of any of the listed impairments in Appendix 1, Subpart P, Regulations No. 4, 20 C.F.R. § 416.924(d).  Tr. 22, 29.  The ALJ then concluded that plaintiff

19 - FINDINGS & RECOMMENDATION

did not have a combination of medically determinable physical or mental impairments that resulted in marked and severe functional limitations. Tr. 28, 29. Accordingly, she concluded that plaintiff was not disabled.

STANDARD OF REVIEW & SEQUENTIAL EVALUATION

I. Adult Claim

A claimant is disabled if unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

Disability claims are evaluated according to a five-step procedure. Baxter v. Sullivan, 923 F.2d 1391, 1395 (9th Cir. 1991). The claimant bears the burden of proving disability. Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989). First, the Commissioner determines whether a claimant is engaged in "substantial gainful activity." If so, the claimant is not disabled. Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b). In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments." Yuckert, 482 U.S. at 140-41; see 20 C.F.R. §§ 404.1520(c), 416.920(c). If not, the claimant is not disabled.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." Yuckert, 482 U.S. at 141; see 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is

20 - FINDINGS & RECOMMENDATION

conclusively presumed disabled; if not, the Commissioner proceeds to step four. <u>Yuckert</u>, 482 U.S. at 141.

In step four the Commissioner determines whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can, he is not disabled. If he cannot perform past relevant work, the burden shifts to the Commissioner. In step five, the Commissioner must establish that the claimant can perform other work. <u>Yuckert</u>, 482 U.S. at 141-42; <u>see</u> 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f). If the Commissioner meets its burden and proves that the claimant is able to perform other work which exists in the national economy, he is not disabled. 20 C.F.R. §§ 404.1566, 416.966.

The court may set aside the Commissioner's denial of benefits only when the Commissioner's findings are based on legal error or are not supported by substantial evidence in the record as a whole. <u>Baxter</u>, 923 F.2d at 1394. Substantial evidence means "more than a mere scintilla" but "less than a preponderance." <u>Id.</u> It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. <u>Id.</u>

II. Child's Claim

An individual under the age of eighteen is eligible for childhood SSI payments based on disability if he or she suffers from "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I).

The Commissioner uses a three-step sequential evaluation

21 - FINDINGS & RECOMMENDATION

process to determine if a claimant is eligible for childhood SSI. 20 C.F.R. § 416.924. Step one requires the Commissioner to determine if the claimant is engaged in substantial gainful activity. 20 C.F.R. § 416.924. If so, there can be no finding of disability. If not, the analysis proceeds to step two.

Step two requires the Commissioner to decide whether the claimant has a severe impairment. An impairment is severe if it is more than a "slight abnormality or a combination of slight abnormalities" and causes more than "minimal functional limitations." 20 C.F.R. § 416.924(c). If the child has no severe impairment, there can be no finding of disability. If there is a finding of severe impairment, the analysis proceeds to step three.

Step three requires the Commissioner to determine whether the impairment "meets or medically equals in severity the set of criteria for an impairment listed in the Listing of Impairments in appendix 1 of subpart P of part 404 of this chapter, or if it is functionally equal in severity to a listed impairment." 20 C.F.R. § 416.924(d); Merrill ex rel. Merrill v. Apfel, 224 F.3d 1083, 1085 (9th Cir. 2000). If this equivalency test is met and the statutory duration requirement is satisfied, the child will be found disabled. 20 C.F.R. § 416.924(d)(1).

The court may set aside a denial of childhood SSI only if the Commissioner applied the incorrect legal standards or if his or her decision was not supported by substantial evidence in the record. 42 U.S.C. § 405(g); Merrill, 224 F.3d at 1084-85.

DISCUSSION

Plaintiff contends that the ALJ erred in the following ways: (1) in finding that plaintiff does not have EBV or CFS; (2) in

22 - FINDINGS & RECOMMENDATION

finding, in regard to the child application, that plaintiff did not have "marked and severe functional limitations" resulting from the combination of her physical and mental impairments before age eighteen; (3) in rejecting the opinion of treating psychologist Dr. McQueen; (4) in rejecting the opinion of treating nurse practitioner Young; (5) in rejecting plaintiff's testimony; and (6) by failing to meet her burden of proving that plaintiff retains the ability to perform "other work" in the national economy.  I address plaintiff's arguments in turn.

I.  Epstein-Barr Virus and Chronic Fatigue Syndrome

As noted above, the ALJ determined, in both the child and adult claims, that plaintiff has severe impairments of personality disorder, somatoform disorder, depression, and a learning disorder. The ALJ found that neither EBV nor CFS were severe impairments.

In support of her conclusion regarding EBV, the ALJ explained that active EBV was not supported in the record.  Tr. 35.  She noted that Dr. Wirth specifically tested for the EBV viral capsid antigen (EBV-VCA) in February or March 2001, but did not diagnose plaintiff with an active EBV infection.  Tr. 311 (noting EBV-VCA test results and omitting EBV from assessment/diagnoses section of chart note); see also Tr. 316-17 (laboratory results of EBV test); 523 (Dr. Wirth's February 26, 2001 note that her EBV virus IgG was strongly positive, suggesting past exposure/immunity to EBV).

The ALJ also noted that other physicians allowed the diagnosis by history or as reported by plaintiff's mother, but attributed no functional limitations to it.  Tr. 35.  In support of this conclusion, the ALJ cites to chart notes from plaintiff's treatment with Dr. William G. Barish, M.D., in Lebanon, Oregon, from May 27,

23 - FINDINGS & RECOMMENDATION

1999, to December 29, 2000.  Tr. 248-61.  The ALJ cites to a page
in which Physician's Assistant Ben Johnson, working in Dr. Barish's
office, reports that plaintiff suffers from cytomegalovirus,
"chronically, I guess, according to her Mom." Tr. 254 (chart note
from May 27, 1999).  Another page from this exhibit suggests that
plaintiff's mother indicated that plaintiff had been previously
diagnosed by physicians in Pennsylvania with EBV.  Tr. 250 (chart
note from December 19, 2000).  Dr. Barish's office apparently did
no independent testing to verify the history as reported by
plaintiff's mother.

As the ALJ stated, the presence of the antibody as revealed by
the testing performed by Dr. Wirth represents only a past
infection, not a current one. According to the National Center for
Infectious Diseases, run by the United States Centers for Disease
Control, EBV is one of the most common human viruses.
www.cdc.gov/ncidod/diseases/ebv.htm.  Most people become infected
with EBV sometime during their lives.  Id.  When infection with EBV
occurs during adolescence or young adulthood, it causes infectious
mononucleosis thirty-five to fifty percent of the time.  Id.

While the symptoms of infectious mononucleosis usually resolve
in one or two months, EBV remains dormant or latent in a few cells
in the throat and blood for the rest of the person's life.  Id.
Periodically, the virus can reactivate and is commonly found in the
saliva of infected persons.  Id.  This reactivation usually occurs
without symptoms of illness.  Id.

Symptoms related to infectious mononucleosis caused by EBV
infection seldom last for more than four months.  Id.  When such an
illness lasts more than six months, it is frequently called chronic

24 - FINDINGS & RECOMMENDATION

EBV infection, however, "valid laboratory evidence for continued active EBV infection is seldom found in these patients." Id. In such cases, the illness should be further investigated to determine if it meets the criteria for CFS. Id.

Plaintiff's February 2001 EBV test results show a positive result on the EBV-VCA IgG. Tr. 316-17. A positive IgG to the VCA "appears in the acute phase, peaks at 2-4 weeks after onset, declines slightly, and then persists for life." www.cdc.gov/ncidod/diseases/ebv.htm. Thus, as the ALJ concluded, plaintiff's EBV test does not substantiate an active EBV. See also Tr. 372 (February 2000 review of EBV laboratory tests to date are consistent with "remote EBV infection [and] are not suggestance [sic] of an active process at this time.").

Plaintiff notes that after reviewing her records at the agency's request, Dr. Morell diagnosed plaintiff with EBV syndrome, noting that she had residual upper cervical chain lymphadenopathy that was mildly tender. Pltf's Mem. at p. 19; Tr. 283. What plaintiff fails to note, however, is that Dr. Morell went on to state that despite the swollen cervical lymph glands, plaintiff appeared well and he expected a complete recovery from the EBV infection. Id. Thus, plaintiff's citation to Dr. Morrell's conclusion does not undermine the ALJ's conclusion that plaintiff did not suffer from an active EBV or that there were no functional limitations associated with it.

Plaintiff also points to a January 24, 2002 chart note by Dr. Willett, assessing plaintiff with EBV. Pltf's Mem. at p. 19; Tr. 309. While Dr. Willett does include EBV in her assessment, this is another example of a diagnosis by history reported by plaintiff's

25 - FINDINGS & RECOMMENDATION

mother. Dr. Willett states that plaintiff "states she has chronic fatigue syndrome, and her and her mother believe it is from the Epstein-Barr virus." Tr. 308. Dr. Willett herself performed no new testing to confirm the presence of any active EBV. In fact, she refers to Dr. Wirth's February 2001 test showing only past exposure and no active virus.

Accordingly, the ALJ's rejection of active EBV is supported by substantial evidence in the record and the ALJ did not err in rejecting EBV as a severe impairment.

As to the CFS, the ALJ stated that the CFS diagnosis "cannot be traced to a medical source prior to the claimant or her mother providing it to the doctor as an already accepted medical diagnosis." Tr. 22, 35. As an example, the ALJ cites to Dr. Barish's July 24, 2000 chart note in which he states that plaintiff reported having been diagnosed with chronic fatigue by an infectious disease specialist in Eugene. Tr. 253. However, the record does not show assessment or treatment by an infectious disease specialist in Eugene.

In February 2000, plaintiff was assessed by an infectious disease specialist in Pennsylvania. Tr. 368-73. At that time, Dr. Green discussed that plaintiff did not meet all of the diagnostic criteria established by the Centers for Disease Control for CFS. Tr. 372. Rather, he suggested that before any diagnosis of CFS could be confirmed, plaintiff should receive a psychiatric evaluation. Tr. 373. He opined that there could be psychological explanations for her fatigue. Id. Interestingly, he also noted that plaintiff's mother told him that an Oregon infectious disease specialist "clearly stated that Sara had chronic fatigue syndrome."

26 - FINDINGS & RECOMMENDATION

Id. Again, I find no such records to substantiate this claim.

Prior to the February 2000 evaluation by Dr. Green, plaintiff's Oregon medical practitioners include "PP" at McKenzie Family Practice, Tr. 476[3], Dr. Belozer at Samaritan Health Physicians in Lebanon, Oregon, from February 12, 1999, to April 6, 1999, Tr. 337-43, and Dr. Goulston, at PeaceHealth Medical Group in Eugene, Oregon, from April 9, 1999, to May 21, 1999. Tr. 344-49. None of these practitioners appear to be infectious disease specialists. Moreover, although Dr. Belozer questioned whether plaintiff had CFS, Tr. 341, she suspected that plaintiff's fatigue was secondary to depression and personality disorder. Tr. 338. She also later noted that plaintiff's "issues" included "questionable chronic fatigue syndrome." Tr. 337. She again expressed a concern regarding underlying depression and a personality disorder. Id. She ultimately suggested that it would be more appropriate for plaintiff and her mother to seek health care at another facility after plaintiff's mother hung up the phone on Dr. Belozer when Dr. Belozer expressed her opinion that plaintiff could indeed go to school. Id.

Dr. Goulston noted only that plaintiff, based on her own report, had a "history of chronic fatigue type syndrome." Tr. 344. Dr. Goulston noted that plaintiff had some positive tender points

---

[3] This medical record contains no self-identifying information and the practitioner is identified only with the initials "PP." The Administrative Record's index identifies this as a medical record from McKenzie Family Practice. Tr. 6. The first chart entry, dated October 10, 1996, refers to plaintiff having just moved "here" with her mother, suggesting that this record belongs to an Oregon medical practice. Tr. 476. There is no indication of any CFS diagnosis. Id.

27 - FINDINGS & RECOMMENDATION

on her chest wall, but had some false positives in the supraclavicular areas and was not tender over her arms.  Id.  In her assessment, she opined that plaintiff may have multiple reasons for her fatigue and that depression may be playing a role.  Id.

In sum, the record supports the ALJ's conclusion that the source for plaintiff's CFS diagnosis is not documented in the record other than by report by plaintiff or her mother. Additionally, as the ALJ further noted, the record shows that plaintiff responded well to some treatments.  E.g., Tr. 311 (Dr. Wirth's April 19, 2001 chart note commenting that plaintiff's chronic fatigue had responded well to the category of anti-depressants known as selective serotonin reuptake inhibitors).

The Ninth Circuit has held that "an impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work."  Harman v. Apfel, 211 F.3d 1172, 1180 (9th Cir. 2000).  Plaintiff bears the burden of establishing the existence of a severe impairment, as well as that any severe impairment has prevented plaintiff from engaging in substantial gainful activity for a period of at least twelve continuous months (adult), or has caused marked and severe functional limitations for a continuous period of not less than twelve months (child).  20 C.F.R. §§ 416.905, 416.906.  For the reasons explained above, plaintiff has failed to establish that she has severe impairments of EBV or CFS.

II.  Treating Psychologist Dr. McQueen

As noted above in the recitation of medical evidence, plaintiff's treating psychologist from October 23, 2001, to

28 - FINDINGS & RECOMMENDATION

approximately November 27, 2001, was Lila McQueen, Ph.D. Tr. 284-99, 386-95, 429-30. Plaintiff contends that the ALJ erred when the ALJ rejected Dr. McQueen's opinions that (1) plaintiff's physical and mental disorders make it difficult for her to concentrate, get and stay organized, remember details, including appointments and deadlines, and impair her ability to make decisions; (2) plaintiff's disorders caused distress in social and occupational functioning; and (3) that full-time work would be difficult or impossible and that even part-time might be untenable.

Where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996). Even if the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record. Id.

The ALJ rejected Dr. McQueen's opinions regarding plaintiff's concentration and organizational abilities, as well as her ability to remember details and make decisions, because those opinions were not supported by Dr. McQueen's own objective testing. Tr. 27, 38. As the record shows, in the November 29, 2001 Attention Deficit Disorder Assessment Report prepared by Dr. McQueen, plaintiff is rated as having no problems in getting or staying organized, and as having "little" problem with being easily distracted and remembering appointments, promises to do things, or items required for school or a task. Tr. 287-88. These findings undermine the validity of Dr. McQueen's contrary opinions regarding plaintiff's abilities and social functioning as expressed in her

29 - FINDINGS & RECOMMENDATION

contemporaneously-executed letters to Linn-Benton Community College and Disability Determination Services. Tr. 285, 293; see also Tr. 330 (Dr. Smolen's May 2002 note that plaintiff adequately performed concentration questions on mental status examination).

Next, the ALJ rejected Dr. McQueen's August 2003 opinion regarding plaintiff's functioning and ability to work full- or part-time because at the time Dr. McQueen rendered that assessment, she had not seen plaintiff in over one year and her last contact with plaintiff had been on July 30, 2002, where plaintiff's mother brought her to see Dr. McQueen, but plaintiff refused to be seen. Tr. 386-87. The record establishes that the treating relationship lasted for about four weeks, from the end of October 2001 to the end of November 2001. Tr. 284-99, 386-95, 429-30. Thus, by the time Dr. McQueen rendered her August 2003 opinion, it had been close to two years since she had had an actual treating relationship with plaintiff.

Moreover, as the ALJ noted, Dr. McQueen's assessment of functioning was based on a November 2001 evaluation, which in turn relied on unsubstantiated reports of CFS and fibromyalgia. Tr. 38; 430. Finally, the ALJ remarked that the determination of disability is reserved to the Commissioner and is not the province of a medical professional.

The ALJ has provided clear and convincing reasons, supported in the record, for rejecting Dr. McQueen's opinions. Dr. McQueen's opinions are not supported by the objective medical testing in the record. As to the August 2003 opinion regarding plaintiff's ability to work, it was made so far in time from the actual treating relationship that the opinion is not considered reliable

30 - FINDINGS & RECOMMENDATION

and based on then-current circumstances.  And, as the ALJ noted, an ALJ is not bound by the opinions of a treating medical practitioner on the ultimate issue of disability.  <u>Reddick v. Chater</u>, 157 F.3d 715, 725 (9th Cir. 1998).

III.   Treating Nurse Practitioner Sandra Young

Young treated plaintiff from February 27, 2002, until June 24, 2003.  Tr. 375-85, 401-12.  Plaintiff contends that the ALJ erred in rejecting Young's opinion that plaintiff was unable to work because of pain and fatigue.

Although Young was a treating nurse practitioner, a nurse practitioner is not an "acceptable medical source."  20 C.F.R. § 404.1513(a)(3).  Rather, such professionals are "other sources" as described in the regulations.  20 C.F.R. § 404.1513(d).  Under Ninth Circuit precedent, an ALJ must either consider the testimony of such a lay witness or provide germane reasons for not crediting the testimony.  <u>Lewis v. Apfel</u>, 236 F.3d 503, 511 (9th Cir. 2001); <u>see</u> <u>also</u> <u>Dodrill v. Shalala</u>, 12 F.3d 915, 918-19 (9th Cir. 1993) (to discount the testimony of a lay witness, the ALJ must give reasons that are "germane to each witness.").

In April 2003, Young opined that plaintiff was unable "to hold down any sort of employment related to pain and severe fatigue."  Tr. 375.  The ALJ rejected Young's opinion because Young was not an acceptable medical source, Young's information regarding the assistance plaintiff required was from plaintiff or other third-party sources who were not credible, the treatment records preceding this opinion show that plaintiff's long-term conditions were stable rather than deteriorating as Young expressed, and Young incorrectly accepted diagnoses of fibromyalgia or CFS.  Tr. 38.

31 - FINDINGS & RECOMMENDATION

The ALJ found that the subjective testimony on which Young relied was from plaintiff and third party reports, whom the ALJ determined were unreliable sources. Tr. 38. Plaintiff's credibility is separately discussed below. As explained there, the ALJ's rejection of plaintiff's subjective testimony is supported by substantial evidence in the record.

The ALJ found that plaintiff's mother was not credible. Tr. 27, 39. The ALJ noted chart notes from Dr. Ladd which stated that plaintiff and her mother wanted plaintiff labeled as having a disability. Tr. 39, 324. The ALJ further noted plaintiff's mother's "red ink notations" to medical exhibits which contradicted statements recorded by practitioners as having been made by plaintiff. Tr. 22 n.1, Tr. 35 n.1; Tr. 27, Tr. 369, Tr. 370. The problem, as the ALJ explained, is that plaintiff's mother was not present and could not have known what her daughter had said to the practitioner. Id.

Additionally, the ALJ cited several places in the record demonstrating a "systematic attempt to use medical claims for secondary gain and from school activity, to getting special treatment in school, to getting diagnoses to support disability claims." Id. (citing Tr. 337 (chart note from Dr. Belozer describing conversation with plaintiff's mother in which plaintiff's mother requested home schooling and Dr. Belozer not concurring with request); Tr. 339-43 (Dr. Belozer chart notes suggesting continued problems with getting plaintiff to go to school); Tr. 293 (November 2001 letter from Dr. McQueen to Linn-Benton Community College regarding plaintiff's appeal for refund); Tr. 324 (February 2002 chart note from Dr. Ladd remarking that

32 - FINDINGS & RECOMMENDATION

plaintiff and her mother "indicate that they would like to have a definite diagnostic label so they could have her labeled as having a disability"); Tr. 354 (January - February 2000 chart notes from Dr. Thomas regarding request from mother for support for half-day school for plaintiff)); see also Tr. 374 (February 7, 2002 chart note from Dr. Willett stating that "[t]he patient and her mother are looking for a diagnosis of fibromyalgia. . . . The patient and her mother do not seem to be happy with not being diagnosed with fibromyalgia and are asking for s second opinion. . . . The patient is trying for a diagnosis of fibromyalgia like her mother and aunt. They are both on disability.").

In support of her determination that plaintiff's mother was not credible, the ALJ also observed that plaintiff's mother tended to advance "suggestions seeking ailments for Sara without reasonable medical cause." Tr. 28. On more than one occasion plaintiff's mother requested medical testing for a problem that was allegedly apparent in other family members, but which was not necessarily apparent in plaintiff. Tr. 28 (citing Tr. 531 (requesting evaluation for spine problem and separately requesting neck x-ray); Tr. 374 (Dr. Willett's note that patient and mother looking for diagnosis of fibromyalgia)).

Given this record, the ALJ's determination that plaintiff's mother was not credible is supported by substantial evidence in the record, and thus, to the extent Young's opinion was based on information provided by plaintiff's mother, the ALJ had a proper basis for rejecting Young's opinion.

Young's treatment records reflect that at her initial appointment, plaintiff complained of fatigue, but was taking a

33 - FINDINGS & RECOMMENDATION

class at the community college and that she ran and exercised daily. Tr. 384. Young later reported that certain medications were working well and although plaintiff appeared "quite fatigued" at one visit, she continued daily exercise, walking, and a home exercise routine. Tr. 383. Later that spring, Young reported that plaintiff was "doing well." Tr. 382. She had moved to Beaverton and was cleaning houses, although she noted that the work wore her out. Id. In August 2002, Young noted that medication was helping the CFS. Tr. 381. In November 2002, Young reported that plaintiff was "doing pretty well" and that her CFS and chronic pain were stable. Tr. 378.

The next visit with Young appears to have been March 18, 2003, when plaintiff complained of severe neck pain. Tr. 376. Young noted that plaintiff was "in the midst of a battle with trying to achieve disability" and that she was unable to work. Id. Young saw plaintiff again on April 2, 2003. Tr. 404. Although plaintiff reported no improvement in her symptoms, Young reported that plaintiff was "in mild physical distress." Id.

In her April 24, 2003 letter in which she expresses her opinion that plaintiff is unable to hold any sort of employment because of her pain and fatigue, Young states that she has seen plaintiff once or twice per month for the past year. Tr. 375. The record does not support this assertion. Tr. 376-84, 404 (office visits with Young on March 19, 2002, May 7, 2002, August 23, 2002, November 18, 2002, March 18, 2003, and April 2, 2003). She was also seen by other practitioners in the same clinic as Young on February 27, 2002, and January 13, 2003. Tr. 377, 384. While there is no doubt that Young was treating plaintiff, the frequency

of her treatment is not as extensive as claimed.

Aside from the March 18, 2003 visit to Young for neck pain, Young's chart notes refer to plaintiff "doing well," "doing pretty well," being in "mild physical distress," being "stable," and exercising and working. Given these treatment records, the ALJ did not err in rejecting Young's opinion that plaintiff's condition was deteriorating.

Finally, for the reasons previously articulated, the record supports the ALJ's determination that plaintiff's CFS was not a severe impairment and thus, the ALJ properly disregarded Young's reliance on this diagnosis as a basis for her opinion regarding plaintiff's inability to work.

IV. Rejection of Plaintiff's Testimony

The ALJ determined that plaintiff was not credible. Tr. 27, 28, 39. The ALJ found that plaintiff and her parents manipulated her housing in an attempt to circumvent the resource requirements for SSI, that plaintiff made false representations to physicians regarding diagnoses, that she engaged in "doctor shopping," and that she was focused on obtaining disability. Tr. 27, 28.

Once a claimant produces objective evidence of an underlying impairment, if there is no affirmative evidence that she is malingering, the ALJ must provide clear and convincing reasons for rejecting her testimony. Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004). Defendant concedes that plaintiff presented objective evidence of impairments that could reasonably be expected to produce some level of symptoms. However, defendant argues, and I agree, that the ALJ provided clear and convincing reasons supported by substantial evidence in the record, to find plaintiff's

35 - FINDINGS & RECOMMENDATION

subjective testimony not credible regarding the severity of her symptoms.

The ALJ noted that plaintiff's first application for SSI was on April 2, 2001, when she lived with her mother in Oregon. Tr. 27. On April 10, 2001, the claim was denied because of plaintiff's mother's excess resources. Id. Plaintiff then moved back to Pennsylvania to be with her father and re-filed her application, with a protective filing date of April 11, 2001. Id. Then, in September, while that application was still pending, she moved back to Oregon to her mother's. Id. One reasonable interpretation of this sequence of events is that plaintiff and her parents manipulated her housing in order to circumvent the resource requirements for SSI. As the ALJ is responsible for determining credibility and resolving ambiguities, Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995), and the evidence is capable of supporting the inference the ALJ drew, it was not error for the ALJ to conclude that plaintiff and her parents had engaged in manipulative conduct.

The record also supports the ALJ's finding that plaintiff has misrepresented her diagnoses to later-consulted physicians. An example noted by the ALJ is plaintiff's representation to Dr. Ladd that she had been diagnosed as having attention deficit disorder when just a few months earlier, Dr. McQueen, to whom plaintiff had been referred specifically to assess for the condition, had determined that plaintiff did not have the disorder. Tr. 289, 324; see also Tr. 402 (June 24, 2003 chart note from nurse practitioner Young stating that plaintiff reported she "continues treatment with Linn County Mental Health"); Tr. 414-28 (treatment records from

36 - FINDINGS & RECOMMENDATION

Linn County Mental Health showing initial intake and treatment plan developed in April 2003, but no actual treatment or contact after that date).

As for "doctor shopping," the record demonstrates that in February 1999, plaintiff began seeing Dr. Belozer in Lebanon, Oregon, to establish care after recently moving from Pennsylvania and living with her father, to living with her mother in Oregon. Tr. 343. She saw Dr. Belozer a few times over the next six weeks until April 6, 1999, when Dr. Belozer disagreed with plaintiff's mother over whether plaintiff could actually attend school. Tr. 337. Then, on April 9, 1999, three days after this disagreement with Dr. Belozer, plaintiff began treating with Dr. Goulston in Eugene, representing to Dr. Goulston at that time that she had moved to Oregon just last month and omitting any reference to her relationship with Dr. Belozer. Tr. 347.

In another instance, plaintiff saw Dr. Willett at the Corvallis Clinic in February 2002. Tr. 374. Dr. Willett had referred plaintiff to Dr. Ladd for an assessment of fibromyalgia. Tr. 324. Dr. Ladd did not find plaintiff to have the disease. At the February 7, 2002 visit with Dr. Willett after Dr. Ladd's assessment, plaintiff expressed unhappiness with Dr. Ladd's diagnosis. Id. Dr. Willett apparently referred plaintiff to a Dr. Hudson in Eugene for further evaluation, but there are no records from a Dr. Hudson in this administrative record. Plaintiff rejected Dr. Willett's recommendation of the fibromyalgia clinic at Oregon Health & Sciences University because she did not want to go that far. Id.

Curiously, instead of continuing treatment with Dr. Willett,

or seeking a consultation with Dr. Hudson, plaintiff began treating with Dr. Gallant at Corvallis Internal Medicine just three weeks after her February 7, 2002 visit with Dr. Willett. Tr. 384. Again, plaintiff represented to this new physician that she had recently moved to Oregon and again omitted any reference to her treatment at the Corvallis Clinic with Dr. Willett. Id.

Moreover, Dr. Willett's February 7, 2002 chart note, as well as others in the record, suggest this change in physician upon receiving a diagnosis or treatment option with which she disagreed, was motivated by an effort to obtain a diagnosis which would support her disability claim. E.g., Tr. 374 (Dr. Willett's February 7, 2004 chart note stating that "patient and her mother are looking for a diagnosis of fibromyalgia. . . . The patient and her mother do not seem to be happy with not being diagnosed with fibromyalgia and are asking for a second opinion. . . . The patient is trying for a diagnosis of fibromyalgia like her mother and aunt. They are both on disability. They are working with social security to get disability for these diagnoses."); Tr. 324 (February 6, 2002 chart note by Dr. Ladd stating that the patient and her mother "would like to have a definite diagnostic label so they could have her labeled as having a disability"); Tr. 280 (chart note of examining physician Dr. David Morrell stating that plaintiff remarked that she planned to move in with a friend "as soon as she receives disability payment"); Tr. 490 (September 1996 chart note from Dr. Albert Turbessi stating that plaintiff's mother "seems to have sought numerous medical opinions to glean a diagnosis of chronic EBV infection").

The record supports the ALJ's finding that plaintiff has

38 - FINDINGS & RECOMMENDATION

"engaged in doctor shopping" in an effort to obtain a diagnosis supportive of disability and that this negatively impacts her credibility. The ALJ's credibility determination is based on clear and convincing reasons, supported by substantial evidence in the record.

V.  Child Application - Marked and Severe Functional Limitations

As noted above, a child is disabled for the purposes of SSI if the child suffers from "a medically determinable physical or mental impairment, which results in marked severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(I).  An impairment causes "marked and severe functional limitations" if it meets or medically equals the severity of a set of criteria for an impairment in the listings or if it functionally equals the listings.  <u>See</u> 20 C.F.R. § 416.924(d).

The ALJ found that plaintiff's condition did not meet or equal the criteria of a listed impairment.  Tr. 22.  As a result, the ALJ next assessed whether any impairments resulted in limitations that functionally equal the listings.  20 C.F.R. § 416.926a(a).  Tr. 23-28.  After a thorough discussion, she concluded that plaintiff's impairments did not cause limitations functionally equal to the listings.  Tr. 28.

To meet the standard of the functional equivalent of a non-listing impairment, the impairment must be of "listing-level severity" which means it must resulted in "'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain[.]"  20 C.F.R. § 416.926a(a).  The delineated "domains of

39 - FINDINGS & RECOMMENDATION

functioning" are (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (4) caring for yourself; and (6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1).

Although the ALJ made findings for each "domain of functioning," plaintiff challenges only the findings in the areas of caring for yourself and health and physical well-being.  Thus, I do not discuss the ALJ's decision regarding the other domains.

In support of her finding that plaintiff did not have a marked or extreme limitation in the ability to care for herself, the ALJ noted that the relevant considerations include how well a child maintains a healthy and emotional physical state, how well a child gets physical and emotional wants and needs met in appropriate ways, how well a child copes with stress and changes in the environment, and how well the child takes care of his or her own health, possessions, and living area.  Tr. 26.

The ALJ concluded that plaintiff is able to do self-care, demonstrating excellent hygiene and grooming and some ability to maintain her home.  Id.  The ALJ recognized that plaintiff reported that she needed help and had to take breaks in housework because of fatigue.  Id.  But, the ALJ concluded, plaintiff was "nonetheless capable of and functions with less than marked limitation in this domain."  Id.  The ALJ also noted that plaintiff has social contact with friends who "hung out" at her home.  Id.

In support of her finding that plaintiff did not have a marked or extreme limitation in the domain of health and physical well-being, the ALJ noted the relevant consideration of the cumulative physical effects of physical or mental impairments, along with

their associated treatments or therapies upon a child's functioning. Id. Additionally, the ALJ noted that the stability of the child's condition and how a child functions during periods of exacerbation of symptoms were considered in this domain. Id.

The ALJ stated that the evidence revealed that plaintiff was primarily limited by alleged fatigue and a refusal to go to school. Id. For example, the ALJ noted, when a treating physician, addressing plaintiff's complaints, wrote a note for her to attend school from 10:30 a.m. to 4:30 p.m., she still only went one time. Id. (citing Tr. 339). And, as the ALJ noted, in 2000, another physician group noted that their efforts to make her attend school full-time had not been successful. Tr. 352.

The ALJ further noted that plaintiff's complaints of fatigue were not supported by any valid diagnosis of chronic fatigue or fibromyalgia. Tr. 26. The ALJ also remarked that the record showed extensive doctor shopping when a denial diagnosis or special benefits were not obtained and that throughout the medical record, her medical examinations were within normal limits. Tr. 26-27. Accordingly, the ALJ concluded that plaintiff had less than marked limitations in health and well-being.

Plaintiff argues that the ALJ erred by not finding that she has a marked or extreme limitation in the domains of caring for herself and health and well-being. As support for her argument, plaintiff simply contends that she "has established that she is frequently ill with episodes or exacerbations more than three times a year that prevent her from engaging in her normal activities[;]" and that her "physical and mental conditions combine to interfere very seriously with her ability to independently initiate, sustain,

41 - FINDINGS & RECOMMENDATION

or complete activities." Pltf's Mem. at p. 21 (internal quotation omitted). Plaintiff cites no evidence in the record in support of these arguments. Presumably then, plaintiff relies on the evidence she cites in support of her other arguments to support this argument.

For the reasons explained in connection with plaintiff's other arguments, however, I reject plaintiff's argument in this regard. In making her assessment, the ALJ cited the correct legal standards. Tr. 24-25. As noted herein, the record supports the ALJ's findings that plaintiff's EBV and CFS are not severe impairments and that plaintiff's subjective testimony is not credible. The record also supports the ALJ's rejection of the opinions of plaintiff's treating psychologist Dr. McQueen and plaintiff's treating nurse practitioner Young.

The ALJ correctly noted that plaintiff has excellent hygiene and grooming and some ability to take care of her home. The ALJ's finding regarding plaintiff's doctor shopping is also supported in the record. And, as the ALJ suggested, plaintiff failed to attend school even when her physician specifically tailored her school obligation to plaintiff's subjective limitations. Thus, the ALJ's finding that plaintiff does not have a marked or extreme impairment in the ability to care for herself or in her health and physical well-being, is supported by substantial evidence in the record.

VI. Ability to Perform Other Work in the National Economy

Finally, plaintiff contends that the ALJ erred in concluding that plaintiff is capable of performing work that exists in significant numbers in the national economy, including jobs such as animal shelter worker/helper, soft goods sorter, printed products

42 - FINDINGS & RECOMMENDATION

distributor, and optical goods worker. Plaintiff argues that the record supports a finding that she can work no more than one to two hours per day and that based on the VE's testimony that such a limitation would preclude all full-time competitive work, the ALJ's conclusion was in error.

I reject plaintiff's argument. For all of the reasons previously discussed, the ALJ did not err in rejecting the evidence in support of plaintiff's claim that she cannot work more than one to two hours per day. There is no competent medical evidence to support plaintiff's assertion and the ALJ's reasons for rejecting her subjective testimony in this regard are well-founded. Thus, the VE's testimony that such a limitation would preclude competitive full-time employment is irrelevant.

CONCLUSION

The Commissioner's decision to deny plaintiff's claims should be affirmed.

SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due September 27, 2005. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

43 - FINDINGS & RECOMMENDATION

1    If objections are filed, a response to the objections is due

2  October 11, 2005, and the review of the Findings and Recommendation

3  will go under advisement on that date.

4    IT IS SO ORDERED.

5                    Dated this  12th   day of  September  , 2005.

6

7

8                              /s/ Dennis James Hubel
                              _____
9                              Dennis James Hubel
                              United States Magistrate Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

44 - FINDINGS & RECOMMENDATION